### ERIE R. CO. v. UNITED STATES.

(Circuit Court of Appeals, Third Circuit. June 21, 1912.)

No. 1,582.

RAILROADS (§ 229*)—REGULATION—INTERSTATE COMMERCE—EQUIPMENT.

Safety Appliance Act March 2, 1893, c. 196, 27 Stat. 531 (U. S. Comp. St. 1901, p. 3174), provides that no common carrier engaged in interstate commerce by railroad shall use on its line any locomotive in moving interstate traffic which is not equipped with a power driving wheel brake and appliances for operating the train-brake system, or to run any train in such traffic that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer can control its speed without requiring the use of hand brakes. Held, that such act did not apply to the switching operations of a railroad in its yard, so that where defendant railroad maintained tracks in Jersey City and Weehawken where trains were assembled and broken up, and from those points taken inland 1½ miles from Jersey City and 3½ miles from Weehawken to Bergen by yard engines, where the cars were again finally reclassified and trains made up to go over the road, it was not guilty of violating the act by failing to have such trains equipped as provided.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 743; Dec. Dig. § 229.*

Duty of railroad companies to furnish safe appliances, see note to Felton v. Bullard, 37 C. C. A. 8.]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexe

In Error to the District Court of the United States for the District of New Jersey.

Action by the United States of America against the Erie Railroad Company. Judgment for the United States, and defendant brings error. Reversed.

Collins & Corbin, of Jersey City, N. J. (Geo. S. Hobart, of counsel), for plaintiff in error.

John B. Vreeland, of Morristown, N. J., U. S. Atty.

Before GRAY and BUFFINGTON, Circuit Judges, and YOUNG, District Judge.

BUFFINGTON, Circuit Judge. In the court below the United States brought suit against the Erie Railroad Company to recover penalties for 26 violations of the Safety Appliance Acts. The verdict was rendered on instructions of the court below, which held that on the facts shown the railroad was guilty of violating the act. On the imposition of a penalty on each of said counts, the railroad sued out this writ of error.

Eighteen of the counts, which we will first consider, charged that the railroad had moved that number of trains without having at least 75 per cent. of said cars controlled by air brakes, in violation of the act of 1893, which provides:

"It shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with a power driving-wheel brake and appliances for operating the train-brake system, or to run any train in such traffic after said date that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer on the locomotive drawing such train can control its speed without requiring brakemen to use the common hand brake for that purpose."

It is conceded by the government that this act does not apply to, or at least has never been enforced as to, switching operations. Manifestly such is the reasonable construction of the act. Its purpose was to compel railroads to equip trains in interstate transit with air brakes, thereby contributing not only to the safety of passengers and crews, but saving brakemen, so far as possible, from the dangers incurred in manipulating hand brakes. That it was meant to apply to train transit as contrasted with switching operations is clear, not only from the essentially different character of the operation, but from the wording of the act itself. Railroad men recognize in the terms "switching crew" and "train crew" the difference between the two occupations. Switching is recognized as the more dangerous work and as calling for the most agile and expert of men, and the language of the act itself, "on its line," "in moving interstate traffic," "to run any train in such traffic," "control its speed without requiring brakemen to use the common hand brake for that purpose," are all fittingly used in describing a train on its line proper running in such traffic and within such control by its engineer, rather than to describe the sorting and switching work carried on in a terminal switching yard. Indeed, a court in its observation of the practical operation of

railroads takes judicial notice of the fact that the transportation work of a great modern railway covers two distinct fields of operation: One, the hauling of its trains in transit; and, the other, the assemblage and distribution of the cars into such trains at terminal points. Indeed, the spacious and extensive territory required for such terminal facilities have in modern railroad practice brought into existence corporate terminal agencies whereby a single terminal system may be utilized by several roads, and the distinctive character of terminal, as contrasted with transportation, service is recognized in United States v. Terminal, etc., Ass'n, 224 U. S. 383, 32 Sup. Ct. 507, 56 L. Ed. 810, No. 386 Oct. Term, 1911, in the Supreme Court of the United States decided April 22, 1912, where it is said:

"We are not unmindful of the essential difference between terminal systems properly so described and railroad transportation companies. The first are but instrumentalities which assist the latter in the transfer of traffic between different lines, and in the collection and distribution of traffic."

Giving then to the act the construction that it was not meant to cover bona fide switching operations, we next inquire whether the car movements here in question were really switching operations of the railroad. The blueprint in evidence in this case shows that Bergen, Weehawken, and Jersey City are outposts of the triangular terminal system of the Erie Railroad, Jersey City and Weehawken being situate under four miles apart on the Hudson river and Bergen about 1½ miles inland from Jersey City and 3½ miles from Weehawken. At Weehawken there are about 80 tracks where cars are received by rail and lighter. These tracks are used for the storage and preliminary classification of cars. After this initial classification the cars are either transferred to other terminals by lighter or hauled in trains to Bergen, where they undergo a further and final classification, and where trains are made up to go out over the road. Intercepting these 80 tracks at Weehawken, which run over the docks, there are two main connecting freight tracks or roads which extend from Weehawken to the eastern portal of the Erie tunnel, which is almost a mile long, and which passes under the Palisades. The yard at Jersey City is used for initial classification in the same way as that at Weehawken for both railroad and lighterage transit, and from it main freight tracks extend to the eastern portal of the Erie tunnel, where they intersect the tracks from Weehawken. Near this tunnel is a cut through which the main Erie tracks run; but the tunnel is used exclusively for the transfer of freight cars between Bergen and Weehawken and between Bergen and Jersey City. Beyond the western end of the tunnel is the yard at Bergen, which contains 110 tracks. In one division of this yard west-bound cars which have been brought from Jersey City and Weehawken are reclassified and drilled into trains which proceed from thence to western destinations. In receiving trains from the west the same process is reversed, viz., reception at the Bergen terminal, classification and distribution into subdivisions for the respective terminals at Weehawken and Jersey City, where they are again classified for docks and other points of destination. The transfers from Weehawken to Bergen and from Jersey

197 F.—19

City to Bergen are limited to 35 cars in each transfer, since the Bergen tracks in some subdivisions of the yard are each limited to 35 cars' capacity.

The question here involved is whether in making such transfers from the Jersey City and Weehawken yards, respectively, to the Bergen yard, the railroad must couple up the air brakes on such trains of cars. To us it seems clear that there was evidence tending to show that the whole triangle formed by the Bergen, Jersey City, and Weehawken yards constitutes unitedly a single terminal classification yard. While the distance between two of these points is over three miles, it is evident, from the narrow strip of land that is left along the river front by the Palisades, that this wide spread of space is topographically required to permit the complicated car transfer and classification of a great railroad's terminal traffic. It is in such yards that the contest against inextricable confusion and freight congestion must be waged. When we consider that in these yards more than 1,500 east-bound cars alone are handled at least twice a day, and that the standing room alone required for these cars, estimating each car at 40 feet, is upwards of 11 miles, without any allowance made for shifting space, the necessity for extended trackage is apparent. These three yards are all under one yardmaster, are all known as the Jersey City Terminal, and cover about 140 miles of track space, and, as we have seen, topographically a part of this yard has to be located at Bergen and to be reached by tunnel. All the work in the Erie Terminal is done by switching crews and engines, and during every movement of the cars in this terminal yard they are not handled in any way by train crews or train engines, nor is there any movement by schedule. As soon as a sufficient number of cars are gathered at any of the classification yards, they are sent forward to the other yard for further classification. The testimony is that, on each of these interyard movements, it would require about half an hour to couple up each train of cars, and the proof is uncontradicted that, if air brake couplings are required, "the congestion at the terminals would be so great that we could not handle our business." It is also shown that these interyard movements are at a speed of from six to eight miles per hour, and, while there are instances when that speed is exceeded by the men, this is against the railroad's orders.

Under these facts we think the court could not say to the jury, as a matter of law, the railroad was guilty of violating the law. To us it is clear that this beneficent law is made to fulfill its purpose when it is applied to trains finally made up for road service. It is to lessen the danger incident to such service, to averting collisions, to control train movements on grades, to obviate as far as possible the danger to men of working hand brakes on icy footings, and other dangers incident to road conditions, that this statute was meant to cover. The government, recognizing that the statute could not be applied to switching operations, has not contended it should be applied there. But it is urged that considerable numbers of the cars initially classified at the three respective points are moved on the main freight

tracks to and through the tunnel, and that they constitute trains, and such movement therefore falls within the wording of the statute. Of course, 35 cars coupled together and drawn by a locomotive make a train, for such connected cars are drawn and follow in the engine's train; but this mere word definition does not settle the question before us. It is not a wrangle over mere names, but rather whether the railroad is here doing a bona fide switching work which the law confessedly was not meant to cover. It has been suggested that railroads by making their terminal yards nominally cover many miles of tracks may evade the law; but, if such a case should ever arise, we now have no such case before us. We have here a question of a great terminal located in a most congested freight center, and where the cost of terminal facilities, to say nothing of the dispatch of traffic, necessarily requires that a road restrict its terminal facilities to the narrowest limits, but where the interchange from land to water routings necessarily calls for larger space. Indeed, the testimony of the government's inspector:

"Q. Is it not the fact that all these trains when they arrived at Bergen, we will say, coming from either Jersey City or Weehawken, are there split up and classified and the cars sent to their different destinations from there? A. Yes, sir; I understand it that way.

"Q. It is what might be termed a classification yard, is it not? A. Yes.

"Q. None of these trains that you have referred to as coming from Jersey City or Weehawken, none of them went any further? A. No; that crew did not pull them further.

"Q. That train was not taken off with the same cars in it? A. I suppose they were reclassified there.

"Q. Each car was taken out and put on the track and then made up with other cars in a train for where they wanted to go. Isn't that the fact? A. I didn't see them do that.

"Q. That is the way they did it when you worked for the company, is it not? A. I suppose that is the general practice.

"Q. And coming east, is it not the fact that they were all stopped at Bergen and sent from there to their destinations? A. Yes, sir; the same as at any other terminal point.

"Q. Exactly as at Buffalo? A. Yes.

"Q. The same as with the terminal at Buffalo? A. Yes, and all over.

"Q. And the arrangement is just the same as at any other terminal yard that you have mentioned? A. Yes, sir."

—shows that practically the same terminal situation as that at Jersey City exists at Buffalo and other terminal points. We are pointed to no conditions incident to this short run which make the use of the air brakes essential to the safety of the shifting crew. The run is a brief one. There are neither grades to encounter, stops to be made, or protracted exposure. Under such circumstances, we think the court was not warranted in taking this case from the jury and itself holding the law had been violated. On the contrary, we think it should have admitted the rejected evidence, which constitutes the first assignment of error, that these were yard movements of cars and should have submitted to the jury the question whether the Bergen, Jersey City, and Weehawken yards together were or were not in fact a single shifting yard and that the car movements in and between the same were switching operations. If the jury find such to

be the case, such finding would seem to dispose of the questions raised by the first eight counts as to the duty of the railroad in reference to the cars whose equipment was found to be defective. So far as the proofs show, these defects were discovered during the classification and inspection made in the terminal. Such being the case, and there being a repair shop provided in such terminal, there is no reason why the railroad should not be permitted to move the defective car from any part of the terminal to such repair shop, and there is every reason why the car should be shifted to that point and every facility for repair there used, nor is there any provision in the statute which forbids such movement in a switching yard.

The case is therefore reversed, with permission to the court below to grant a new trial if so moved by the government.