UNITED STATES v. LOUISVILLE & JEFFERSONVILLE BRIDGE CO.

(District Court, W. D. Kentucky.   November 18, 1916.)

1. RAILROADS ☞229—OPERATION—SAFETY APPLIANCE ACT—"TRAIN."

Safety Appliance Act March 2, 1893, c. 196, § 1, 27 Stat. 531 (Comp. St. 1913, § 8605), provides that from and after the 1st day of January, 1898, it shall be unlawful for any railroad engaged in interstate commerce to use locomotives in interstate traffic not equipped with a power driving wheel brake and appliances for operating the train-brake system, so that the speed of the train can be controlled without use of the common hand brake.   Amendatory Act March 2, 1903, c. 976, § 1, 32 Stat. 943 (Comp. St. 1913, § 8613), declares that the act shall be held to apply to all trains used on any railroad engaged in interstate commerce, and section 2 (Comp. St. 1913, § 8614) gives authority to the Interstate Commerce Commission to make rules for the safe-guarding of employés and passengers.   A rule of the Interstate Commerce Commission of June 6, 1910, declares that after September 1, 1910, not less than 85 per cent. of the cars of any train operated with power or train brakes shall have their brakes used and operated by the engineer, and all power-braked cars shall have their brakes so used and operated.   *Held* that, the act being for the protection of employés and passengers, it does not apply to mere switching operations, where cars as such are moved to and fro and the string of cars does not constitute a train.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 743;  Dec. Dig. ☞229.

For other definitions, see Words and Phrases, First and Second Series, Train.]

2. RAILROADS ☞229 –OPERATION—SWITCHING OPERATIONS.

Under such acts, the movement of a string of cars for some distance through the yards on tracks used by regular trains in interstate commerce, was not, the string being transferred from the yards of one company to those of another, a mere switching operation, and the string of cars must be considered a train, so that the operation without connecting the power brakes on 85 per cent. of the cars with the engine, was in violation of the acts.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 743;  Dec. Dig. ☞229.]

At Law.   Action by the United States against the Louisville & Jeffersonville Bridge Company.   Judgment for the United States for the full amount claimed.

Perry B. Miller, U. S. Dist. Atty., of Louisville, Ky., and Monroe C. List, Sp. Asst. U. S. Atty., of Washington, D. C.

Humphrey, Middleton & Humphrey, of Louisville, Ky., for defendant.

EVANS, District Judge.   In this action the United States seeks, in 12 separate paragraphs, to recover 12 separate sums, of $100 each, for 12 separate violations of the Safety Appliance Act.   The defendant has admitted its liability for 2 of the penalties claimed, namely, those set up in the eighth and eleventh paragraphs of the petition, but contests its liability for the other 10.

The parties, pursuant to the statute, have, by a stipulation in writing, submitted the case to the judgment of the court without the inter-

vention of a jury. They have, also in writing, stipulated the facts upon which the court is to determine the right of the United States to recover; it being admitted that, if the plaintiff is entitled to recover upon 1 of the other 10 paragraphs, it is entitled to recover upon all of them, the facts being the same.

[1] The statute under which the liability of the defendant exists, if it exists at all, is an act to promote the safety of employés and travelers upon railroads, etc., approved March 2, 1893 (27 Stat. 531), as it was amended by the act approved March 2, 1903 (32 Stat. 943). Section 1 of the act first referred to provides:

"That from and after the first day of January, eighteen hundred and ninety-eight, it shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with a power driving-wheel brake and appliances for operating the train-brake system, or to run any train in such traffic after said date that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer on the locomotive drawing such train can control its speed without requiring brakemen to use the common hand brake for that purpose."

Section 1 of the amendatory act approved March 2, 1903, provided that the original act "shall be held to apply to all trains * * * used on any railroad engaged in interstate commerce," and section 2 thereof gave authority to the Interstate Commerce Commission to make, and on June 6, 1910, it made, an order as follows:

"It is ordered that on and after September 1, 1910, on all railroads used in interstate commerce, whenever, as required by the Safety Appliance Act as amended March 2, 1903, any train is operated with power or train brakes, not less than 85 per cent. of the cars of such train shall have their brakes used and operated by the engineer of the locomotive drawing such train, and all power-braked cars in every such train which are associated together with the 85 per cent. shall have their brakes so used and operated."

The plaintiff in its petition in substance alleges that the defendant, at all the times when it was doing the things complained of, was a common carrier engaged in interstate commerce by railroad in the state of Kentucky, and that in violation of the statutes and order above set forth, and at the various times mentioned in the petition, it operated in interstate commerce trains on its line of railroad, which trains were drawn by locomotive engines and operated with power or train brakes. It is further alleged that the defendant operated each of the trains referred to in the petition over its line of railroad in and about Louisville, in Kentucky, and did so when none of the cars in the train had their brakes used and operated by the engineer of the locomotive drawing the train, and when less than 85 per cent. of the cars which composed the train had their brakes used and operated by the engineer of the engine drawing the train.

The defendant's answer by proper denials put in issue all the plaintiff's averments which charge any wrongful acts or acts violative of the statutes and order above set forth.

At the trial all of the testimony heard was embraced in a stipulation in writing and an accompanying map, and the portions of the testimony upon which we think the case must turn will be summarized further along.

At the hearing the case for defendant was put upon the proposition that the movements of defendant's cars described in the testimony were, in fact, mere "switching operations," and upon the theory of law that they did not, for that reason, come within the reach of section 1 of the Safety Appliance Act, as amended, requiring that its provisions shall be "held to apply to all trains * * * on any railroad engaged in interstate commerce." The latter contention of the defendant was mainly based upon the soundness of the theory referred to, and, while plaintiff's argument did not, in terms, concede that the law of the case must turn on that issue, it did not appear to contest it.

It is important, therefore, to ascertain whether that theory has been authoritatively established by decisions construing the statute, and, at the threshold of the inquiry, the case of United States v. Erie Railroad Co. takes the place of first importance. That was a suit brought by the United States in the United States District Court for the District of New Jersey for the recovery (among other things not necessary to mention) of penalties incurred by the Erie Railroad Company upon facts analogous to those set up in those parts of the petition in this case which are now under consideration. The District Court held that the railroad company was liable, and the jury returned a verdict accordingly. Judgment having been rendered on the verdict, the case was carried to the Circuit Court of Appeals for the Third Circuit. That court, speaking through Judge Buffington (197 Fed. 287, 116 C. C. A. 649), reversed the District Court upon the ground that the act did not apply to the switching operations of a railroad. The case was again tried, and the District Court, yielding, of course, to the requirements of the ruling of the Circuit Court of Appeals, directed a verdict for the railroad company, and, judgment having been rendered accordingly, the case was again taken to the Circuit Court of Appeals, and was there affirmed. 212 Fed. 853, 129 C. C. A. 307. The case then went to the Supreme Court, and its opinion thereon is found in 237 U. S. 402, 35 Sup. Ct. 621, 59 L. Ed. 1019. The judgment of the Circuit Court of Appeals and of the District Court were reversed, and a new trial directed.

The Circuit Court of Appeals, in an able opinion, had vindicated the construction of the statute upon which it had held that switching operations by a railroad company were not within section 1 of the Safety Appliance Act, as amended, and the Supreme Court so far yielded to the general proposition as to say, on pages 407, 408, of 237 U. S., on page 624 of 35 Sup. Ct., 59 L. Ed. 1019:

"It will be perceived that the air-brake provision deals with running a train, while the other requirements relate to hauling or using a car. In one a train is the unit and in the other a car. As the context shows, a train in the sense intended consists of an engine and cars which have been assembled and coupled together for a run or trip along the road. When a train is thus made up and is proceeding on its journey it is within the operation of the air-brake provision. But it is otherwise with the various movements in railroad yards whereby cars are assembled and coupled into outgoing trains, and whereby incoming trains which have completed their run are broken up. These are not train movements, but mere switching operations, and so are not within the air-brake provision. The other provisions calling for automatic couplers and

grabirons are of broader application, and embrace switching operations as well as train movements, for both involve a hauling or using of cars."

The court, however, said that it was persuaded that the use of the transfer trains in that case were not in fact switching operations, but that the assemblages of cars there coupled and hauled were "trains" which came within the purview of the air-brake provisions of the statute, and on page 408 of 237 U. S., on page 624 of 35 Sup. Ct., 59 L. Ed. 1019, said:

"They were made up in yards like other trains, and then proceeded to their destinations over main line tracks used by other freight trains, both through and local. They were not moving cars about in a yard, or on tracks set apart for switching operations, but were engaged in main line transportation, and this in circumstances where they had to pass through a dark tunnel, over switches leading to other tracks, and across passenger tracks whereon trains were frequently moving. Thus it is plain that, in common with other trains using the same main line tracks, they were exposed to hazards which made it essential that appliances be at hand for readily and quickly checking or controlling their movements. The original act prescribed that these appliances should consist of air brakes controlled by the engineer on the locomotive, and the act of 1903 declared that this requirement should 'be held to apply to all trains.' We therefore conclude and hold that it embraced these transfer trains."

In United States ,v. C., B. & Q. R. R. Co., 237 U. S. 410, 35 Sup. Ct. 634, 59 L. Ed. 1023, the question was whether the air-brake requirements of the statute were applicable to the transfers described in the record in that case. The District Court's judgment that they were was reversed by the Circuit Court of Appeals for the Eighth Circuit, and the case was taken to the Supreme Court. In its opinion reversing the judgment of the Circuit Court of Appeals, and affirming that of the District Court, the Supreme Court (237 U. S. 412, 413, 35 Sup. Ct. 634, 635, 59 L. Ed. 1023) said:

"The three trains, the running of which is charged to have been violative of the statute, were transfer trains of the class just described. They were run from one yard to the other on August 9, 1910, and were composed, respectively, of 42, 36, and 39 cars, of which only 9 in one train and 10 in each of the others had their air brakes connected for use by the engineer. At that time air brakes were required to be used on 75 per cent. of the cars in a train. [In re Power of Train Brakes] 11 Interst. Com. Com'n R. 429, 437. Giving effect to the views quite recently expressed in United States v. Erie Railroad Company, 237 U. S. p. 402 [35 Sup. Ct. 621, 59 L. Ed. 1019], we think these trains came within the air-brake requirement, which the amendatory act of 1903 declares 'shall be held to apply to all trains * * * on any railroad engaged in interstate commerce.' According to the fair acceptation of the term they were trains in the sense of the statute. The work in which they were engaged was not shifting cars about in a yard or on isolated tracks devoted to switching operations, but moving traffic over a considerable stretch of main line track—one that was a busy thoroughfare for interstate passengers and freight traffic. Every condition suggested by the letter and spirit of the air-brake provision was present. And not only were these trains exposed to the hazards which that provision was intended to avoid or minimize, but unless their engineers were able readily and quickly to check or control their movements they were a serious menace to the safety of other trains, which the statute was equally designed to protect."

Thus it would seem that the Supreme Court approved rather than otherwise the proposition announced by the Circuit Court of Appeals

in the Erie Railroad Case, 197 Fed. 287, 116 C. C. A. 649, to the effect that the Safety Appliance Act did not apply to the switching operations of a railroad, and differed from the Circuit Court of Appeals only upon the question of fact as to whether what had been done in that case constituted switching operations or was the use of "trains" in interstate commerce. The Supreme Court held it to be the latter and not the former.

[2] Assuming, as we must, that while what are really switching operations in the proper sense do not come within the air-brake requirements of section 1 of the Safety Appliance Act, we are brought to the question whether the transfers in this case by the defendant were in fact "switching operations," and therefore not within the act, or whether the "strings of cars" were "trains" and within its provisions. The tests by which we must be guided in reaching a conclusion are supplied in the cases we have cited.

The facts in previous cases were, of course, different in detail from those disclosed here. The latter may be shortly stated as follows:

After a so-called "drag or string," consisting of 26 or more cars, was assembled in the Hancock street yard, a locomotive engine was attached to carry it westwardly to Preston street, which it crossed at grade, and then moved northwestwardly to Floyd street, which it also crossed at grade. From Floyd street it was carried further westwardly, for about the length of the drag or string, upon the track leading up to and over a slight incline called the "hump" between Floyd and Brook streets. Then it was stopped, and, the switches in its rear being thrown, it was pulled or pushed back by the locomotive eastwardly until it repassed the switch near Floyd street, when it was again stopped, and, the switches being thrown so that it could be done, it was carried westwardly again into the Illinois Central yard between Floyd and Brook streets. The locomotive was then detached, and the transfer of the cars in the string, from the Hancock street yard to the Floyd street yard, was completed; the two yards being about three city blocks apart.

The stipulated facts are that this transfer from the Hancock street yard to the incline called the "hump" was over tracks used for the main line movements of the Big Four passenger trains in both directions, and that the transfer from the incline to Floyd street and west thereof was over the tracks used by the Big Four and Chesapeake & Ohio for main line passenger trains in both directions and also for the movement of freight trains by the Illinois Central between its various yards. Further stipulated facts are that, while all of the cars were equipped with power or air brakes, yet that during their movements over the tracks none of them had such brakes used and operated by the engineer, the speed being controlled by the use of power brakes on the engine and tender, because of the fact that the air hose through which the air is applied for the operation of the power or train brakes was not coupled. It thus appears that the brakes on the cars were not used and operated by the engineer of the locomotive drawing the train, and that 85 per cent. of them could not have been used and operated

by him as required by the order of the Interstate Commerce Commission.

The map shows many tracks through the region between Hancock and First streets (a distance of five city blocks), but those used for the movement of the drags or strings of cars are not isolated from the other tracks, nor are they specially set apart for the operation of the "drags," but are tracks devoted to the main line movement of passenger trains of the railroads mentioned, as well as to the movement of freight trains by the Illinois Central. The distance over which the transfers were made here was not so great as those in the cases cited at the argument, but we think the length of the track used is not the material factor. Rather that factor is the character of the other uses to which the track is put. The other uses are the things which increase the dangers against which the law provides a measure of protection.

When the purposes for which the safety appliance legislation was enacted are considered in connection with the cases we have analyzed and others that might be mentioned, it seems to be clear that the facts stipulated bring this case within the provisions of the act as amended, and we are constrained to the conclusion that the operations described in the stipulations of facts are not switching operations as that phrase has been defined, but that the strings of cars used in those operations were "trains" to which the provisions of the act must be applied. Being trains in this sense, the testimony shows that in respect to each of them there was a violation of the order of the Commission.

This being our conclusion, judgment must go against the defendant, not only for the $200 admitted to be due, but for the entire $1,200 claimed in the petition.