CHICAGO, B. & Q. R. CO. v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. November 28, 1913.)

No. 3892.

1. RAILROADS (§ 229*)—SAFETY APPLIANCE ACT—CONSTRUCTION—EQUIPMENT OF CARS—"ON ITS LINE."

The Safety Appliance Act of March 2, 1893, c. 196, § 2, 27 Stat. 531 (U. S. Comp. St. 1901, p. 3174), which makes it unlawful for a railroad engaged in interstate commerce to use "on its line" any car not equipped with automatic couplers, etc., applies to cars being moved in switching operations, in which, in fact, the greater part of the coupling and uncoupling of cars is done.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 743; Dec. Dig. § 229.*]

2. RAILROADS (§ 229*)—SAFETY APPLIANCE ACT—EQUIPMENT OF CARS.

It is not a defense to an action for violation of such provision by using a car with a defective and inoperative coupler that the car to which it was coupled was in perfect condition, and that the two could have been uncoupled without the necessity of going between them.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 743; Dec. Dig. § 229.*]

3. RAILROADS (§ 229*)—SAFETY APPLIANCE ACT—ACTION FOR VIOLATION—DEFENSES.

To bring a railroad company within the protection of Act April 14, 1910, c. 160, § 4, 36 Stat. 299 (U. S. Comp. St. Supp. 1911, p. 1328), which provides that, where a car shall have been properly equipped, but the equipment shall become defective while being used, it may be hauled from the place where it is first discovered "to the nearest available point where

such car can be repaired without liability for the penalties * * * if such movement is necessary to make such repairs and such repairs cannot be made except at such repair point," it must be shown, not only that the repairs could not have been made where the defect was discovered, but that the movement of the car was for the purpose of making the repairs.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 743; Dec. Dig. § 229.*]

4. RAILROADS (§ 229*)—SAFETY APPLIANCE ACT—ACTION FOR VIOLATION—DEFENSES.

It is not the duty of a government inspector, on discovering that a railroad company is using a defective car in violation of the statute, to notify the company of such fact.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 743; Dec. Dig. § 229.*]

5. RAILROADS (§ 229*)—SAFETY APPLIANCE ACT—TRAIN BRAKE PROVISIONS—CONSTRUCTION.

The provisions of the Safety Appliance Act of March 2, 1893, c. 196, § 1, 27 Stat. 531 (U. S. Comp. St. 1901, p. 3174), as amended by Act March 2, 1903, c. 976, § 2, 32 Stat. 943 (U. S. Comp. St. Supp. 1911, p. 1315), and supplemented by an order of the Interstate Commerce Commission, requiring that in any train operated by power or train brakes at least 75 per cent. of the cars shall be so equipped that their brakes can be operated by the engineer, do not apply to switching operations, and the movement by a switching crew of defendant railroad company of a string of cars from one terminal yard to another in the same city, for distribution of the cars into outgoing trains, in accordance with the practice in the modern system of freight terminals, was a switching operation, although the distance between the yards was two miles and the cars were moved over a main line track also used by other roads.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 743; Dec. Dig. § 229.*

Duties of railroad companies to furnish safe appliances, see note to Felton v. Bullard, 37 C. C. A. 8.]

6. WORDS AND PHRASES—"TRAIN."

The word "train" covers any string of cars hauled by an engine.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 8, pp. 7056, 7057, 7818.]

Hook, Circuit Judge, dissenting in part.

In Error to the District Court of the United States for the Western District of Missouri; Arba S. Van Valkenburgh, Judge.

Action by the United States against the Chicago, Burlington & Quincy Railroad Company. Judgment for the United States, and defendant brings error. Reversed in part.

H. C. Timmons, of Kansas City, Mo. (William Warner, O. H. Dean, and W. D. McLeod, all of Kansas City, Mo., on the brief), for plaintiff in error.

Hugh C. Smith, of Kansas City, Mo., and Philip J. Doherty, of Washington, D. C. (Leslie J. Lyons, of Kansas City, Mo., on the brief), for defendant in error.

Before HOOK and CARLAND, Circuit Judges, and AMIDON, District Judge.

AMIDON, District Judge. The government brought this action to recover penalties for violations of Safety Appliance Act, Act March

2, 1893, c. 196, 27 Stat. 531 (U. S. Comp. St. 1901, p. 3174) as amended by Act April 1, 1896, c. 87, 29 Stat. 85 (U. S. Comp. St. 1901, p. 3175), and Act March 2, 1903, c. 976, 32 Stat. 943 (U. S. Comp. St. Supp. 1911, p. 1314).

The first count is based upon section 2. It charges defendant with using on its line a car when the coupling apparatus of the "A" end thereof was out of repair and inoperative. The issues upon this count were submitted to a jury, and resulted in a verdict in favor of the government, upon which judgment was entered in the sum of $100.

[1] The car was moved from the Twelfth Street yard in Kansas City, Mo., across the Missouri river, over the bridge and main line of the company, to the Murray Street yard. The evidence was quite clear that at the time the movement started the coupling apparatus was out of repair, and continued so throughout the movement. It is first urged by the company that this movement was a switching operation, and not "on the line" of the company within the meaning of the statute; in other words, that section 2 of the act does not relate to the movement of cars in switching. The coupling and uncoupling of cars, however, is confined almost wholly to such operations, and to hold that it is not a violation of the law to have the coupling and uncoupling apparatus in a defective condition at such times would be a clear nullification, not only of the language of the statute, but of its manifest purpose. This assignment of error is therefore wholly devoid of merit.

[2] It was also shown that the coupling apparatus on the car to which the car in question was coupled was in perfect condition, and that the two cars could have been uncoupled by the use of the lever on the first-mentioned car, and for this reason it is urged that the cars could be uncoupled "without the necessity of men going between the ends of the cars," and hence there was no violation of section 2. That section, however, makes it a crime to use "any car" upon which the coupling apparatus is not operative, and we think that under this statute every car is a unit, and must have its coupling apparatus in condition. Norfolk & W. Ry. Co. v. U. S., 177 Fed. 623, 101 C. C. A. 249. The argument of plaintiff in error in support of this contention is based mainly upon the decisions of this court in Morris v. Duluth, S. S. & A. Ry. Co., 108 Fed. 747, 47 C. C. A. 661; Gilbert v. Burlington, C. R. & N. Ry. Co., 128 Fed. 529, 63 C. C. A. 27; Suttle v. Choctaw, O. & G. R. R. Co., 144 Fed. 668, 75 C. C. A. 470; and Union Pacific Ry. Co. v. Brady, 161 Fed. 719, 88 C. C. A. 579. In those cases it was held that a switchman was guilty of contributory negligence in going between cars to uncouple them if the lever upon either car was operative. The opinions contain no suggestion, however, that the company in suffering the coupling appliance upon one car to be inoperative was not guilty of a violation of the Safety Appliance Act. On the contrary, all those decisions proceed upon the ground that the company was guilty of such a violation of the law, but held that the plaintiff was guilty of contributory negligence which defeated his right of recovery because, notwithstanding the company's breach of duty, there was a safe way in which the employé could have uncoupled the cars, and he was bound to choose that way rather than the dangerous method of going between the cars.

[3] The company also urges that the car in question comes within the proviso of section 4, Act April 14, 1910, c. 160, 36 Stat. 298 (U. S. Comp. St. Supp. 1911, p. 1327). That proviso enacts that where any car shall have been properly equipped, as provided in the act—

"and such equipment shall have become defective or insecure while such car is being used by such carrier upon its line of railroad, such car may be hauled from the place where such equipment is first discovered to be defective or insecure to the nearest available point where such car can be repaired, without liability for the penalties * * * if such movement is necessary to make such repairs and such repairs cannot be made except at such repair points."

The evidence tended to show that the car was received by defendant from the Atchison, Topeka & Santa Fé Railroad Company at Kansas City; that before it was received it was inspected and found to be in proper condition, and that the company first learned that the coupling appliance was out of repair after the car had been moved into the Murray yard. There was evidence, however, on the part of the government inspectors that they examined the car while it was in the Twelfth Street yard, and found it in a defective condition; that they accompanied it to the Murray Street yard, and there informed the company's employés of its defective condition, who thereupon promptly supplied the defective part. The trial court submitted to the jury the question whether the car was defective when it started from the Twelfth Street yard, or became defective in the course of its journey from that yard to the Murray yard, charging them that if the defect arose while the car was in transit, the company would not be liable. The jury accepted the testimony of the government inspectors, and found that the car was defective before it started upon the movement complained of. It is quite clear, therefore, that the company is not protected by the proviso upon which it relies. That is so for two reasons: First, the defect was of a character that could have been supplied in the Twelfth Street yard. It consisted of a small clevis which had fallen out of the coupling appliance. This could have been supplied as well in one yard as the other, and a car can be moved for purposes of repair under the proviso only when such a movement is necessary; that is, when the repair is of a character which requires the taking of the car to some particular point. Second, the movement which is permitted must be for the purpose of making repairs, and the evidence showed that the movement complained of was not of that character.

[4] The company also urges that it was the duty of the government inspectors when they discovered the defective condition of the car in the Twelfth Street yard to inform the company's employés so that the defect could be supplied before the car was moved. Such a ruling would make it almost impossible for the government to enforce the statute. It would be difficult, indeed, to show at the conclusion of a trip that the car was defective when the movement started. Such evidence could only be obtained from railway employés, and as a rule, would show that the witnesses themselves were guilty of negligence in not remedying a known defect. Government inspectors are no part of the company's repair force. It is their duty to ascertain whether or not the company is violating the statute. They can do that effective-

ly in no other way than that adopted by the inspectors in the present case.

The trial court committed no error as to the first count, and its judgment upon that count is therefore affirmed.

Counts 2, 3, and 4 are based on section 1 of the Safety Appliance Act, 27 Stat. 531, as amended by section 2, Act March 2, 1903, 32 Stat. 943. The first statute provides as follows:

"That from and after the first day of January, 1898, it shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with a power driving wheel brake and appliances for operating the train-brake system, or to run any train in such traffic after said date that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer on the locomotive drawing such train can control its speed without requiring brakemen to use the common hand brake for that purpose."

Section 2 of the act of March 2, 1903, fixes the minimum percentage of cars having air brakes coupled up at 50 per cent., and empowers the commission, after full hearing, to increase that minimum percentage, and makes a failure to comply with any such requirement of the Interstate Commerce Commission subject to the like penalty as failure to comply with any requirement of the statute. After the passage of this act the Interstate Commerce Commission promulgated a regulation fixing the minimum of cars having air brakes coupled at 75 per cent. of the train.

The second cause of action charges the defendant with moving a transfer train consisting of 42 cars, engaged in interstate traffic, having only nine cars upon which the air was coupled up. The third cause of action charges the movement of a similar train consisting of 36 cars, having only 10 cars upon which the air was coupled up. The fourth cause of action charges the movement of such a train containing 39 cars, and having the air coupled up on only 9 cars.

The evidence showed that each of these trains was in charge of a switching crew, was hauled by a switch engine, had no caboose, and had not been moved as a train over defendant's line, nor was it intended to be moved as a train. Defendant has two yards at Kansas City, Mo., one known as the Twelfth Street yard, south of the Missouri river, and the other the Murray yard north of that river. These two yards together constitute a terminal yard. Trains coming in from the west are broken up in the Twelfth Street yard, and such cars as are to go forward to eastern points are distributed upon tracks according to the practice in modern railroading. Strings of these cars are then drawn out at the eastern end of the system of tracks by a switch engine, and transferred to the Murray yard, where they are again redistributed according to the connecting carriers, who are to move them forward to eastern points. The distance between the yards is about two miles. The line on the bridge across the Missouri river is a single line, and is about 3,000 feet long. The tracks between the two yards are intersected by the terminal road at Kansas City. The line across the bridge is used not only by defendant, but by the Wabash and Rock Island Railroad Companies for both freight and passenger trains. The movement of trains in this territory is controlled by block signals. Trains such as those here complained of have no schedule, and are not under

the control of the train dispatcher, but are moved by the yardmaster. The principal issue upon these counts was whether trains of the character described are subject to the provisions of the law requiring 75 per cent. of the air brakes to be coupled up. The trial court held that they were, and directed the jury to return a verdict in favor of the government. This action of the court is the principal ground of error assigned upon these counts.

[5] It is not controverted by the government that the provisions of the Safety Appliance Act in regard to air brakes have not heretofore been regarded as applicable to switching operations. This has been the interpretation of executive officers charged with the enforcement of the act, and is justified by the language of the statute. The words, "on its line," "in moving interstate traffic," "to run any such train in such traffic," are properly applicable to trains moving from point to point rather than to switching operations. We do not think the act of 1903 was intended to make any change in the original statute in this respect. That statute was passed to correct the decision of this court in the case of Johnson v. Southern Pacific Railway Co., 117 Fed. 462, 54 C. C. A. 508, and was mainly declaratory. Johnson v. Southern Pacific, 196 U. S. 1, 21, 25 Sup. Ct. 158, 49 L. Ed. 363.

The controversy here presented has arisen because of a change in the method of doing switching at important terminal points since the passage of the statute. When the act was passed terminal yards consisted of main tracks and a system of sidings upon which cars were moved by the old "push and pull" system. Even in such yards the main tracks of the road were used to a considerable extent in switching operations. The immense increase in the volume and density of traffic upon American railroads since 1898 has compelled a complete reconstruction of terminals at all important points. These terminals now consist of at least two systems of ladder tracks operated by gravity, or by the hump and gravity systems combined. In one of these yards incoming trains are broken up and the cars distributed upon different sidings according to their destination. From these sidings strings of cars are pulled out and moved forward to another system of tracks constructed upon the same plan as the first, and there distributed upon sidings so as to constitute trains to be carried forward by connecting carriers. For trains moving in the opposite direction the process is simply reversed. Another ladder of sidings in the yard in which the cars were assembled into trains becomes a yard for classification, and the classification yard becomes the yard in which cars are assembled into trains to be carried forward in the opposite direction. In this reconstruction of terminals old yards have, as a rule, been used as one end of the system, and carriers have been compelled to go considerable distances to find land that could be acquired at any reasonable price for the other end. While the record is silent on the subject, we have no doubt that this was the reason for the location of the Murray yard across the river. Standard works such as Droege's Freight Terminals and Trains, published in 1912, give the history of this development and the construction of present-day terminals and the methods of handling cars therein. The double system of yards above described

211 F.—2

is the simplest form now in use, and in important terminals, instead of there being two yards, the traffic has compelled the construction of several yards. In the publication referred to such yards are described with drawings, which make both their structure and method of operation much more plain than any verbal description. This combination of yards constitutes a single terminal yard, and is just as indispensable in the switching of freight cars at the present time as the old system of sidings was a few years ago.

[6] This case was tried mainly by the dictionary. We have much reasoning of counsel upon general principles. What we would have preferred would be an accurate description of the development of the terminal yards at Kansas City; the present structure of those yards, the method of handling trains therein; the speed at which transfer trains are moved between the yards; the control over such trains afforded by the coupling up of the air upon a part of the cars only; whether in actual practice, with the air coupled up on six to ten cars, the engineer can control the speed of these transfer trains from the locomotive, "without requiring brakemen to use the common hand brakes for that purpose;" what, if any, accidents have resulted from the failure to couple up 75 per cent. of the air; the time that would be consumed in coupling up 75 per cent. of the air on such trains; the number of trains that are moved in the yard; the effect upon the movement of cars in such terminal yards if 75 per cent. of the air had to be coupled up on all these strings of cars. In other words, the evidence should do all that could be done to place the court in the same position as an experienced railroad man in judging of these transportation questions. Instead of reasoning from such a disclosure of the actual facts, the attempt is made to deduce the decision of the case from the definition of the word "train" by a process of abstract reasoning. One fundamental trouble with such reasoning is that it proves too much. The word "train" of course covers any string of cars hauled by an engine. But if the statute is to be applied to all trains falling within this definition, then it would cover all movements of cars by means of a locomotive in switching operations, and it would make no difference whether that movement was on a main track or a siding. Such a result reduces the reasoning to an absurdity, because its application to railroads would operate as an embargo upon commerce. Because of these results, as well as from the language of the statutes, we are of the opinion that the air-brake sections of the Safety Appliance Acts were not intended to apply to switching operations. But if the statute at the time of its enactment was not intended to apply to such operations, may the court, because those operations have been enlarged since the passage of the act, apply the statute to the new conditions? We think not. That is a matter for Congress and not for the courts. If conditions have so changed in our modern terminal yards as to require that strings of cars, moved by a switch engine from one yard to another in the breaking up and making up of trains, shall be subject to the air-brake provisions of the Safety Appliance Acts, Congress ought so to provide. The whole question turns upon two points: First, do the air-brake provisions of the Safety Appliance Acts apply to switching op-

erations? Second, was the movement of the strings of cars here involved a good-faith switching operation? We are satisfied that the movement of these trains was as genuinely a switching operation as the old movement when terminal yards were less extended than they are now. Being of that opinion, and that the air-brake sections of the Safety Appliance Acts were not intended to apply to switching movements, we think the trial court committed error when it directed the jury to return a verdict in favor of plaintiff.

At no time since the passage of the Safety Appliance Act in 1893 has it been the practice to couple up the air upon cars which were being moved in switching operations. This has been equally true whether the movement was upon sidings or upon main lines. At any time during the period referred to it has been possible to see hourly, not only at terminal points, but at any divisional point, such trains moving from one yard to another over the main lines of the road without coupling up the air. The same is true of trains moving from the yards of one carrier to yards of a connecting carrier at the same divisional point. It is true that such yards, as a rule, are less distant from each other than yards in the great terminal systems of important centers of traffic. It seems to us, however, impossible for courts to develop different rules according to the length or character of the main line that is used in such operations. The statute attempts to make no such classification, and, in our judgment, courts would be guilty of palpable legislation if they should attempt to do so.

The most difficult problem that confronts railroads at the present time is to prevent strangulation of the arteries of commerce at these great terminal points. The traffic of half the continent at certain seasons of the year rushes down upon these centers. Thousands of cars have to be distributed and recombined daily in these terminal yards. There is no evidence in this record as to the time that would be consumed in coupling up 75 per cent. of the air on these transfer trains, but it was shown in a similar case (Erie Railroad Company v. United States, 197 Fed. 287, 116 C. C. A. 649) that it would take at least half an hour. In cold weather it would take considerably more than that time. The movement of the trains from one yard to the other at the rate of six to eight miles an hour would take less than 20 minutes. The result is that nearly twice the time would be consumed in coupling up the air that is needed for the brief movement of the train, and this with the clear certainty that at the end of the journey the air would have to be again uncoupled in order to distribute the cars. If such delay is necessary for public safety, all will agree that safety should be placed above speed. But, considering the shortness of the journey and the slowness of the speed, there is no evidence in this record that the safety of the public or of employés requires the coupling up of 75 per cent. of the air on these transfer trains. Furthermore, the question is for Congress, and not for the courts.

The identical question which is here presented was before the Circuit Court for the Third Circuit in Erie Railroad Co. v. United States, 197 Fed. 287, 116 C. C. A. 649, and, we think, was there properly decided, notwithstanding its criticism in United States v. Pere Marquette R. R.

Co., 211 Fed. 220, in the District Court of the United States for the Western District of Michigan, decided September 5, 1913.

The judgment of the trial court as to causes of action 2, 3, and 4 is reversed, with directions to grant a new trial.

HOOK, Circuit Judge (dissenting in part). I am unable to concur in the conclusions of the court upon the second, third, and fourth counts, which charge defendant with moving on its line of railroad three trains in which the train brakes on the prescribed percentage of cars were not connected. Each string of cars, one of 32, another of 36, and the third of 39 was hauled as a unit, without switching in transit, from one of defendant's yards to another. The yards at their nearest points were about two miles apart. The movement over this intervening distance was by a main line track used constantly in the freight and passenger traffic of three great railroad systems into and out of Kansas City, Mo.—the Burlington, the Rock Island, and the Wabash. Three thousand feet of this distance was by the defendant's single-track Hannibal bridge across the Missouri river, one of the important and most congested arteries of commerce in that part of the country. About 4,000 feet including the bridge was used by the passenger trains of the three railroad systems in gaining access to the Union Station. This stretch of main line track intersected a track of another railroad company and from 12 to 15 tracks of a terminal company.

Defendant's contentions which the court sustains are: First, that the train-brake provisions of the Appliance Acts (27 Stat. 531; 29 Stat. 85; 32 Stat. 943) do not apply to switching operations; second, that the movements of the cars in question were of that character. I will not stop to consider the first of these, except to say that in some switching operations compliance with the requirement in question may be impracticable, and for that reason may not have been enforced as to them. But it is another thing to declare generally that switching operations are without the statute, and then to attribute to that phrase such a broad meaning as to impair the very intent of Congress. The test of the application of the statute is in the essential nature of the conditions presented, not in the words by which they may be conveniently described. Otherwise the fate of the legislation would depend upon extraneous phraseology. It is noteworthy that the phrase "switching operations" does not appear in the statute, though that would have been the easy, obvious way had Congress broadly intended to exempt them. Here that result is reached by construction. The last act (32 Stat. 943) declares that the provisions and requirements "relating to train brakes * * * shall be held to apply to all trains * * * used on any railroad engaged in interstate commerce." No broader declaration can be conceived. No exception like that urged upon us appears, and a court should be most careful in inserting one by construction. If to observe the intent of an act of Congress "any car" includes a locomotive engine (Johnson v. Southern Pacific, 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. 363), it would seem that the expression "all trains used on any railroad engaged in interstate commerce" should be held to include the three trains of defendant. In view of the decisions of the courts

it is too late to say the three strings of cars with their engines were not "trains" within the meaning of the law.

An argument in aid of the exemption of switching operations is deduced from the expression "on its line" in section 1 of the act of March 2, 1893. Whatever force there may have been in this disappeared when Congress provided by the act of March 2, 1903, that the requirements should be held to apply to all trains used on any railroad engaged in interstate commerce. If we keep in view the letter and the spirit of the law and the evils intended to be lessened or prevented, it seems to me the defense of switching operations is manifestly untenable. Among the dangers which Congress had in mind were those which arose from the movement of trains not quickly controllable by coupled power brake appliances. It also appears from the proceedings in Congress that the dangers to brakemen from the slippery tops of cars and overhead obstructions were especially regarded. The train-brake provisions would take the brakemen from the places of peril while the trains were moving.

The purpose of defendant in making up these trains at the point of origin and its intended disposition at destination are purely adventitious, and so of the absence of markers and the movement by switch engines and crews. In the passage of the trains all the dangers were present as patently as if they had been solid through trains from distant cities, as to which no one would doubt the applicability of the statute. Two of the three trains in question, each composed of an engine and more than 30 cars, moved from the Murray yards north of the Missouri river to the Twelfth Street yards in Kansas City. If they had been preceded by a freight train from Chicago, separated by a passenger train from Omaha and followed by a freight train from St. Louis, all five moving on the same stretch of main line track used in interstate commerce, only the last three, according to defendant, would have been within the train-brake provisions of the statute. Yet in each case every condition suggested by the letter and spirit of the legislation would be present: Each a train; each on a railroad engaged in interstate commerce; each moving with the same character of motive power; each at every stage of its progress menaced by similar dangers, and each equally a source of danger to others; the same intersections; the same overhead obstructions. Though three would be subject to the statute, it is said two would not, and the anomaly is sought to be justified by the contention that the movements of the two from yard to yard were "switching operations," employing a phrase not found in the statute. There may be reasons in practice for the exemption of some such operations, but if admitted it should be with a much narrower scope than that claimed in this case. It should not be held to cover the transfer of long strings of cars over extended distances of main line track in the midst of through traffic. The exemption has been allowed here for reasons of inconvenience, not impracticability.