## PENNSYLVANIA CO. v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. May 8, 1917.)

No. 2905.

1. RAILROADS ⬤⟳254(2)—EQUIPMENT OF TRAINS—AUTOMATIC COUPLERS.

The liability for failure to obey Act March 2, 1893, c. 196, § 2, 27 Stat. 531 (Comp. St. 1916, § 8606), as amended by Act March 2, 1903, c. 976, § 1, 32 Stat. 943 (Comp. St. 1916, § 8613), making it unlawful for interstate carriers to haul cars not equipped with automatic couplers, is absolute, and not dependent upon lack of reasonable care.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 765, 766, 768, 770.]

2. RAILROADS ⬤⟳254(6)—EQUIPMENT OF TRAINS—AUTOMATIC COUPLERS.

That cars, the automatic couplers on which had become defective, were hauled by an interstate carrier, showed prima facie a violation of Comp. St. 1916, § 8606, as amended by section 8613, and cast upon the carrier the burden of showing affirmatively that its act was within Act April 14, 1910, c. 160, § 4, 36 Stat. 299 (Comp. St. 1916, § 8621), authorizing the hauling of defective cars to the nearest available point for repair.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 772.]

⬤⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. RAILROADS ⟲254(6)—EQUIPMENT OF TRAINS—AUTOMATIC COUPLERS.

In an action for penalties for hauling a number of bad-order cars not equipped with automatic couplers to a point where they were to be repaired, agreed facts as to the capacity of nearer repair points and the congestion of cars thereat awaiting repairs *held* not to show as a matter of law that the movement of the cars was justified by the conjecturally possible saving of a few days in effecting the repairs.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 772.]

4. RAILROADS ⟲229—EQUIPMENT OF TRAINS—AIR BRAKES—"TRAIN."

Under the provision of Safety Appliance Act March 2, 1893, as to the use of air brakes, made applicable by amendment of 1903 (Comp. St. 1916, §§ 8613, 8614) to all trains and all cars used on any railroad engaged in interstate commerce, a number of bad-order cars, fastened together by chains, together with an engine, tender, and caboose, constituted a train, even though it would be highly inconvenient to apply the trainbrake provision to such cases, and might necessitate limiting the number of chained-up cars hauled to 15 per cent. of the cars in the train, as the train-brake provision is absolute and mandatory.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 743.

For other definitions, see Words and Phrases, First and Second Series, Train.]

Error to the District Court of the United States for the Northern District of Ohio; John H. Clarke, Judge.

Action for penalties by the United States against the Pennsylvania Company. Judgment (237 Fed. 471) for the United States, and defendant brings error. Affirmed.

Wm. L. Day, of Cleveland, Ohio, for plaintiff in error.

Philip J. Doherty, of Washington, D. C., and E. S. Wertz, U. S. Atty., of Cleveland, Ohio, for the United States.

Before KNAPPEN and DENISON, Circuit Judges, and EVANS, District Judge.

KNAPPEN, Circuit Judge. This is an action brought by the United States to recover from the Railroad Company penalties for alleged violation of the federal Safety Appliance Acts. On July 25, 1913, the Railroad Company made up at Mosier, Ohio, a "hospital" train of 25 empty, bad-order cars, not equipped with automatic couplers operating automatically, and all but one fastened to the other cars by means of chains, together with an engine, tender, and caboose. The train ran from Mosier to Haselton, Ohio, where it took on 8 more bad-order cars, similarly defective, and similarly chained to the adjoining cars. The entire train then ran to Dock Junction, Erie, Pa., for purpose of having the cars repaired there. The petition contained 34 counts. The first 25 relate to the hauling of the 25 cars from Mosier to Dock Junction; the twenty-seventh to the thirty-fourth, inclusive, to the hauling of the 8 cars from Haselton to Dock Junction; the twenty-sixth count charged the operation of the train when less than 85 per cent. of the cars were controlled by air brakes, the engine and tender only being so controlled. All the cars had originally been equipped with automatic couplers, which became defective while in use, and all were equipped for air-brake control. The Rail-

road Company defended under the proviso of section 4 of the amendatory act of 1910 (36 Stat. 299, U. S. Comp. Stat. 1916, § 8621), relating to the hauling of defective cars to the nearest available point for repair. The case was tried by the court upon a stipulation of agreed facts and a waiver of trial by jury. There was no testimony outside the stipulation. The sixth count was dismissed by agreement. The present Mr. Justice Clarke, who presided, filed a written opinion, announcing the conclusion that the Safety Appliance Acts had been violated, and assessing a penalty for each of the 33 violations. No findings of fact or of law were requested. The only finding made was the general one, contained in the judgment that "the finding of the court is in favor of the United States in each of the 33 causes of action pleaded."

The assignments of errors present only the proposition that judgment should have been for defendant. It is questionable whether the stipulation of agreed facts is so far an agreement as to the ultimate, as distinguished from the evidential, facts as to make the general finding in plaintiff's favor reviewable in the absence of specific request for ruling or finding.[1] But as counsel for both parties have at least impliedly or tacitly treated the submission as raising the question whether, as matter of law, the general finding is supported by the agreed facts, we are content to so treat it for the purposes of this opinion.

[1] As to the defective couplers: By Act March 2, 1893 (chapter 196, 27 Stat. 531, U. S. Comp. Stat. 1916, § 8606), as amended by Act March 2, 1903 (chapter 976, 32 Stat. 943, U. S. Comp. Stat. 1916, § 8613), it is made unlawful for any common carrier engaged in interstate commerce by railroad to haul on its line any car not equipped with automatic couplers capable of being coupled and uncoupled without the necessity of a man going between the ends of the cars. The liability for failure to obey this provision is absolute, and not dependent upon lack of reasonable care. St. Louis, I. M. & S. R. R. Co. v. Taylor, 210 U. S. 281, 28 Sup. Ct. 216, 52 L. Ed. 1061; Chicago, B. & Q. R. R. Co. v. United States, 220 U. S. 559, 31 Sup. Ct. 612, 55 L. Ed. 582; Gt. Northern R. R. Co. v. Otos, 239 U. S. 349, 36 Sup. Ct. 124, 60 L. Ed. 322. The act has been broadly construed in recognition of its remedial and humanitarian purpose. Johnson v. So. Pacific R. R. Co., 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. 363, holding that the words "any car" include locomotives; Schlemmer v. Buffalo, etc., R. R. Co., 205 U. S. 1, 27 Sup. Ct. 407, 51 L. Ed. 681, holding that the same words include shovel cars; Southern Ry. Co. v. United States, 222 U. S. 20, 32 Sup. Ct. 2, 56 L. Ed. 72, holding that

1 Wilson v. Merchants' Loan & Trust Co., 183 U. S. 121, 22 Sup. Ct. 55, 46 L. Ed. 113; N. Y. Life Ins. Co. v. Dunlevy (C. C. A. 9) 214 F. 1, 4, et seq., 130 C. C. A. 473; United States v. Stockyards Co. (C. C. A. 8) 167 Fed. 126, 92 C. C. A. 578; National Surety Co. v. Railroad Co. (C. C. A. 6) 145 Fed. 34, 76 C. C. A. 19; Perkins & Co. v. Von Baumbach (C. C. A. 8) 185 Fed. 265, 107 C. C. A. 371; Pennsylvania Casualty Co. v. Whiteway (C. C. A. 9) 210 Fed. 782, 127 C. C. A. 332; Mason v. United States (C. C. A. 8) 219 Fed. 547, 135 C. C. A. 315; Burrows v. Niblack Co. (C. C. A. 7) 84 Fed. 111, 28 C. C. A. 130; Mound Valley Brick Co. v. Mound Valley Gas Co. (C. C. A. 8) 205 Fed. 147, 123 C. C. A. 478.

the act applies to all cars used on any interstate railroad, and is not confined to cars engaged in interstate commerce; Southern Ry. Co. v. Crockett, 234 U. S. 725, 34 Sup. Ct. 897, 58 L. Ed. 1564, holding that the requirement of standardized drawbars applies to locomotives. Section 4 of the amending act of 1910 (36 Stat. 299, U. S. Comp. Stat. 1916, § 8621), after expressly penalizing the hauling on an interstate line of a car not equipped as provided by the Safety Appliance Acts, contains a provision that where any car shall have been properly equipped as provided in such acts, and the equipment shall become defective or insecure while the car is being used by the carrier upon its line of railroad, "such car may be hauled from the place where such equipment was first discovered to be defective or insecure to the nearest available point where such car can be repaired, without liability for the penalties imposed by" the Safety Appliance Acts, "if such movement is necessary to make such repairs and such repairs cannot be made except at such repair point"; and it is on this provision that defendant plants its defense.

[2] It is to be noted that section 5 of the act of 1910 (Comp. St. 1916, § 8622) also expressly forbids the movement of such defective cars otherwise than within the express limitations of section 4 (Gt. Northern R. R. Co. v. Otos, 239 U. S. 349, 352, 36 Sup. Ct. 124, 60 L. Ed. 322). The fact that the cars were hauled in the condition in which they admittedly were shows prima facie a violation of the provisions of the sections mentioned. The burden is thus cast upon defendant to show affirmatively that its act is within the proviso of section 4 of the act of 1910. Schlemmer v. Buffalo, etc., R. R. Co., 205 U. S. 1, 10, 27 Sup. Ct. 407, 51 L. Ed. 681; United States v. Trinity & B. V. Ry. Co. (C. C. A. 5) 211 Fed. 448, 453, 128 C. C. A. 120.

[3] Stating the case most favorably to defendant, it is liable to the penalties in question unless, as matter of law, the agreed facts justified the movement complained of; in other words, unless upon such agreed facts a reasonable mind could reach no other conclusion than that the cars had to be moved for the purpose of the repairs,[2] that Dock Junction was the nearest available point (not the most available) where the repairs could be made, and that the repairs could not be made except at Dock Junction.

The stipulation of agreed facts, so far as now material, shows this situation: Each of the 33 cars in question had been "bad-ordered" at various points within the Youngstown district at dates ranging from May 15th to June 29th, both inclusive. In that district defendant had three regularly established repair points, one at Mosier, one at Market street in Youngstown, 3 or 4 miles easterly of Mosier, and one at Haselton, about the same distance east of Market Street in Youngstown. It also had repair shops at Ashtabula, about 60 miles from Youngstown, at Mahoningtown, about 18 miles from that place, and

---

[2] Section 4 "distinctly excludes from this permission all cars which can be repaired at the place where they are found to be defective." United States v. Erie R. R. Co., 237 U. S. 402, 409, 35 Sup. Ct. 621, 59 L. Ed. 1019; United States v. C., B. & Q. R. R. Co. (C. C. A. 8) 211 Fed. 12, C. C. A. ——; United States v. C. & O. R. R. Co. (C. C. A. 4) 213 Fed. 748, 752, 130 C. C. A. 262.

at Dock Junction, Pa., about 97 miles from Mahoningtown and apparently about the same distance from Youngstown. At each of these points a force, of repair men was regularly maintained, and materials and supplies kept on hand for freight car repairs, as to defects both in structure and with respect to the safety appliance acts. Each of these repair yards, including Dock Junction, had on July 25th cars on hand awaiting repairs in excess of the repair track capacity; or, as witnesses for defendant would testify, at none of the yards in question, between *May 15th and July 26th,* "was there any place *on the repair tracks* to handle cars in excess of the number then awaiting repairs in the reasonably necessary and practicable method of operating a railroad." The three yards in the Youngstown district held 171 bad-order cars, including the 33 cars in question. The combined repair track capacity was 60 cars. During the 13 days from July 18th to July 31st the daily output from the three Youngstown yards was 27 cars, and the number originating 30 cars. During this 13-day period there was thus an average daily accumulation of 3 cars; but the congestion as compared with other portions of the season is not fully shown. In the Ashtabula yards the number of cars on hand was 389; its repair track capacity being 229 cars. The yards were less congested than much of the time during June and July. From May 31st to July 31st the average daily output was 51 cars, the average number originating 53, an average daily accumulation of 2 cars. Except in July, a smaller force seems to have been employed in 1913 than in 1912, and the output in the former year was less than in the latter by 234 cars. In the Mahoningtown district the number of cars on hand awaiting repair was 129, which was much less than was frequently the case during June and July of that year. It had a repair track capacity of 75 cars. The number of bad-order cars repaired on the shop tracks in July had increased each year from 1911 to 1913, as had also the freight car repair force; the average daily output of repaired cars is not shown, nor the average number originating daily in that district. But although there were at each of the repair yards cars awaiting repairs in excess of the repair track capacity, the stipulation shows that witnesses for defendant, if called, would testify that "it was not physically impossible to have made the necessary repairs * * * on other than the repair tracks at any of said places between May 15 and July 26, 1913"; and although it was shown that at the yards in the Youngstown district the average force of workmen had increased each year for 2 years, and that in July, 1913, additional repairmen had been sent from the Mahoningtown shops, there was no express showing that the force could not have been further increased availably for work on other than the repair tracks, nor that it was not feasible to increase the repair track space at these various yards in the Youngstown district, as well as elsewhere.

But it is apparent from what has been, said that, assuming that the average extent of repairs required on the entire 171 cars in the Youngstown district awaiting repair on July 25th, including the 33 cars in question, was no greater than on those repaired from July 18th to July 31st (there was no evidence on this point, unless in the

fact that the majority of the 33 cars required certain enumerated heavy repairs), the 33 cars referred to would in regular course, even if at the foot of the list, have been reached and repaired within less than 7 days from July 25th, laying out of account such opportunities as there may have been for repair previous to that time. The only justification for moving the cars to Dock Junction would thus seem to be that they could be immediately repaired upon the repair tracks themselves; but it appears that there were already on hand there, previous to the arrival of the 33 cars in question, 36 more cars than the repair tracks would hold, and there is no showing whatever of either the daily output or the daily average number originating in the Dock Junction district, and for all that appears there may have been required, in regular course, fully as much, if not more, time to make the repairs in question at the Dock Junction yards as at the yards in Youngstown, notwithstanding the lower percentage of congestion as compared with repair track capacity. Indeed, the record affirmatively shows that, of the 33 cars in question, but 3 were actually repaired as early as July 30th, 5 days after the interstate journey was begun, the repairs on the remainder being made at dates ranging from July 30th to August 6th.

If then, for the purposes of this opinion, we adopt the construction of the statute most favorable to defendant, it is clear that we cannot say that a reasonable mind could not fairly conclude that defendant has not sustained the burden of showing that, under the circumstances, the hauling of this "hospital" train, with its large number of chained-up cars, a distance of about 100 miles from the Youngstown yards over an interstate railroad, past other repair points, with the menace, not only to the employés upon this train, but also to other traffic upon the road, was justified by the conjecturally possible (and apparently improbable) saving of a few days time in effecting the repairs.

[4] As to the air brakes: We agree with the learned District Judge who presided below, that the train-brake provision applies to the movement in question. It applies to "all trains" and to all cars "used on any railroad engaged in interstate commerce." Sections 1 and 2, Act March 2, 1903, 32 Stat. 943 (U. S. Comp. Stat. 1916, §§ 8613, 8614). It has been held applicable to movements of purely transfer trains between two yards but a few miles apart, belonging to the same railroad, though carrying no caboose and although the tracks were not used for passenger traffic, United States v. Erie R. R. R. Co., 237 U. S. 402, 406, 407, 409, 35 Sup. Ct. 621, 59 L. Ed. 1019 (and see United States v. C., B. & Q. Ry. Co., 237 U. S. 410, 35 Sup. Ct. 634, 59 L. Ed. 1023); also to a "drag" or train of cars hauled by a transfer engine, without caboose, from the railroad yards over a main line of railway to a private manufacturing plant (C. & O. Ry. Co. v. United States [C. C. A. 4] 226 Fed. 683, 687, 141 C. C. A. 439). There is no room for doubt that the 34 cars in question, with the engine, tender, and caboose, constituted a train.

But it appears by the agreed statement that on the cars which had the broken end and center sills the air hose could not be coupled up without danger of being pulled apart or uncoupled, on account

of the slack in the chains; that notice that the 33 cars and caboose were not coupled up with the air hose was given the engine and train crews engaged in the movement; that the train was operated at but about 10 miles an hour, and that there were no other repair points on the road of the train except the ones already mentioned; and that a witness for defendant would testify that, when moving a train of defective cars chained together in the way in which the train in question was moved, it is considered the safer practice to have the air brakes used only on the locomotive and tender.

In Erie R. R. Co. v. United States, 240 Fed. 28, decided March 6th last, we held that the provision of section 4 of the act of 1910 which forbids the hauling of defective cars by means of chains is limited to their use in connection with "revenue trains or in association with other cars that are commercially used, unless such defective cars contain live stock or 'perishable' freight"; and in the instant case the train contained no cars in commercial use and none containing live stock or perishable freight.

But the train-brake provision, like the Safety Appliance Acts generally, is absolute and mandatory. C. & O. Ry. Co. v. United States, supra, 226 Fed. at page 686, 141 C. C. A. 439; Virginian Ry. Co. v. United States (C. C. A. 4) 223 Fed. 748, 139 C. C. A. 278; United States v. Pere Marquette R. R. Co. (D. C.) 211 Fed. 220, 222, cited with approval in United States v. Erie R. R. Co., supra, 237 U. S. at page 409, 35 Sup. Ct. 621, 59 L. Ed. 1019. The most that can be said against the applicability of the train-brake provision to cases like the instant case is that such use would be highly inconvenient and necessitate limiting the number of chained-up cars hauled to 15 per cent. of the number of cars in the train. But arguments of convenience cannot prevail against an absolute and mandatory provision, designed for the protection, not only of employés of the given train, but of employés and travelers on other trains. This argument of inconvenience was answered in Virginian Ry. Co. v. United States, supra, where it was held that a railroad company, which cannot move an interstate train of a large number of cars at a slow speed and keep the same under control with the use of power brakes alone, and which can operate trains of fewer cars with safety without the use of hand brakes, cannot justify the use of the latter brakes on trains containing a large number of cars. All the mischiefs and dangers incident to the situation condemned in United States v. Erie R. R. Co., supra, United States v. C., B. & Q. Ry. Co., supra, and C. & O. Ry. Co. v. United States, supra, are present in fully as great, if not in greater, force here.

The judgment of the District Court is affirmed.