### UNITED STATES v. SPOKANE INTERNATIONAL RY. CO.

District Court, D. Idaho, N. D.   December 22, 1928.

No. 1021.

H. E. Ray, U. S. Atty., of Boise, Idaho, and James S. Hawley, Special Counsel for Interstate Commerce Commission, of Washington, D. C., for the United States.

Ezra R. Whitla, of Cœur d'Alene, Idaho, for defendant.

CAVANAH, District Judge. The United States brings this action against the Spokane International Railway Company to recover penalties for alleged violations of the Federal Safety Appliance Acts (45 USCA § 1 et seq.). Three counts are embraced in the complaint, which were, after the overruling of the demurrer, submitted to the court upon an agreed statement of facts without the intervention of a jury. Counts 1 and 2 are based on section 2 of the Act of March 2, 1893, as amended by the Act of March 2, 1903 (45 USCA §§ 2, 8–10). They charge the defendant with using on its line, over a part of a highway of interstate commerce, two cars when the coupling apparatus of the "A" ends thereof were out of repair and inoperative, and count 3 is based upon section 2 of the Act of April 14, 1910 (45 USCA § 11), and charges the defendant with also using on its line, over a part of a highway of interstate commerce, one car with the hand brake out of repair and insufficient.

The facts, in so far as they relate to the questions presented, appear to be that the defendant was and is a common carrier, engaged in interstate commerce by railroad. On June 1, 1928, it and the Great Northern Railroad Company maintained parallel tracks running through Bonner county, Idaho, adjacent to Dover, a station of the defendant, and at which place there existed an exchange or interchange track running from the Great Northern's track to the main track of the defendant. The transfer track at that point is used for the purpose of interchanging cars from the Great Northern to the defendant, and particularly log cars used in shipping logs to the mill of the Dover Lumber Company, located on a spur track. The Great Northern is also a common carrier, engaged in interstate commerce by railroad, and has for some time engaged in hauling logs from a point near Bonners Ferry, in Idaho, to the mill of the lumber company, in Idaho, and that for the purpose of transferring logs to the mill of the lumber company it puts the loaded cars on the interchange track between the defendant and the Great Northern, and the defendant then transfers or switches the loaded cars to the unloading dock of the lumber company, and in so doing couples onto the west end of the cars and hauls them off from the interchange track, entering at times the main track at the switch, and then proceeds westward along the main track, which is used by the defendant's interstate passenger and freight trains, for a distance of 260 feet, at which point the movement is reversed, and the cars are pushed down the spur track for a distance of approximately 3,000 feet to the mill where the cars are spotted and unloaded.

On the day in question, the Great Northern spotted on the interchange track a string of thirteen standard gauge flat cars, and included in them were the three cars referred to in the complaint, which were defective as alleged at the time they were delivered by the Great Northern on the interchange track and until they arrived at the mill. The crew employed by the defendant, at about 7:40 a. m., coming from Sandpoint with defendant's engine, found the string of cars on the transfer track, and moved them from and onto the main track of the defendant for the purpose of securing a string of unloaded flat cars situated on the dock of the lumber company and placing them on the transfer track as the

transfer track was blocked by the loaded cars, including the three cars in question. After placing the empty cars on the transfer track, it again connected its engine having air brakes to the loaded log cars which were all connected together, and proceeded along defendant's main line to a point where the movement was reversed, and the cars were then pushed in on the spur track for a distance of about 3,000 feet to the docks, where they were spotted for unloading. All of the cars were loaded with logs, and were intrastate shipments, and none of them contained interstate freight, and their movement on defendant's main line was for the purpose of clearing the interchange track so that empties could be placed upon it and conveying them from point "B" to point "C" upon defendant's main line, where they could be pushed into the spur track leading to the mill.

In moving the string of cars from the interchange track to the mill, they are ordinarily, and were on this particular movement, moved as a single unit, without uncoupling or coupling a single car, except the coupling made between the first car and the engine. The transfer of the cars was done under a written contract between the defendant and the Great Northern, and the transfer track running to the lumber company's plant is constructed upon a roadbed built and owned by the lumber company, and the ties for the road were furnished by the lumber company, and is a private line belonging to it, but the steel used on it was furnished by the defendant. The transfer and spur tracks to the lumber company's dock were jointly owned by the defendant and the Great Northern, and under the contract between them the Great Northern was given the joint right to the use of the transfer and spur tracks, and the defendant transfers the cars for the Great Northern, furnishing its crews, under the provision of the contract that "the crews while engaged in such switching shall be deemed joint employés of the parties," and that the crews were acting as such joint employés in switching and transferring the cars complained of. The spur track leading from defendant's main line is used for the purpose of transporting cars loaded with logs and lumber from its main line to the mill, and some of which are destined to points outside of the state from the mill to its main line for further movement. In making the transfer or switching of the cars, the defendant does not receive any part of the freight paid, but is paid $2 per car by the Great Northern for making such switch, and the cars are billed to the Dover mill direct over the Great

Northern and are not handled by the defendant under any waybilling, but on request of the Great Northern the defendant spots and switches the cars for it. All of the string of thirteen cars belonged to the Great Northern.

It further appears that on June 1, 1928, when the cars in question were delivered on the exchange track, Inspector Haughness, acting for the defendant, inspected the cars spotted on the exchange track of the Great Northern at about 6:30 a. m., and found them to be in a defective condition. He then gave to the agent of the Great Northern at Dover a list of the defects, with the request that they be repaired before being received by the defendant. Repairs were made upon some of the cars, but not on the three in question. The conductor of defendant's train then inquired if the repairs were made, and was informed that they had been. After arriving at the docks, the repairman of the Great Northern completed the repairs on the cars. The kink in the chain in the coupler was caused by the links connecting the lever with the pin in the coupler dropping in the head of the coupler, and on many occasions the movement of the train will pull out the kinks, and when not done all that appears necessary was to use a small bar to straighten out the kinks, or remove the chain from the head of the coupler, or remove the clevis holding the chain, then straightening out the chain and reattaching the clevis. Or on many occasions the kink in the chain can be straightened by taking hold of the chain with the hand and twisting it and removing it from the head of the coupler, which will require one going in between the ends of the cars.

Separate complaint was filed by the government against the Great Northern, upon exactly the same defects as charged here against the defendant.

It appears that both the defendant and the Great Northern were "engaged in interstate commerce by railroad," and the Safety Appliance Acts, which it is claimed the defendant violated, make it unlawful for railroads to use cars not equipped with "couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars and with efficient hand brakes." At the time of the discovery of the defects in the couplings and brakes of the three cars, they and the other cars of the train were being used in moving intrastate traffic, but were used upon highways of interstate commerce as they were at times during the movement of the train

moved over the main lines of both the defendant and the Great Northern, which were highways of interstate commerce.

Under such conditions, we find that the Supreme Court has never hesitated to declare the power of the United States to remove obstructions of every character from every avenue of commerce that may directly or indirectly interfere with or impede the flow of interstate traffic, and has, in considering the acts under consideration, repeatedly held, in cases brought by the government to recover penalties for a violation of the acts with respect to cars, some of which were moved in intrastate traffic upon a railroad which was a part of a through highway for interstate traffic, that the 1903 amendment enlarged the scope of the original act so as to embrace cars used on a railroad that is a highway of interstate commerce, whether the particular cars are at the time employed in interstate commerce or not. In Southern Ry. Co. v. United States, 222 U. S. 20, 24, 32 S. Ct. 2, 3, 56 L. Ed. 72, the court clearly recognized this doctrine, saying:

"The real controversy is over the true significance of the words 'on any railroad engaged' in the first clause of the amendatory provision. But for them the true test of the application of that clause to a locomotive, car or similar vehicle would be, as it was under the original act, the use of the vehicle in moving interstate traffic. On the other hand, when they are given their natural signification, as presumptively they should be, the scope of the clause is such that the true test of its application is the use of the vehicle on a railroad which is a highway of interstate commerce, and not its use in moving interstate traffic. And so certain is this that we think there would be no contention to the contrary were it not for the presence in the amendatory provision of the third clause 'and to all other locomotives, tenders, cars, and similar vehicles used in connection therewith.' In this there is a suggestion that what precedes does not cover the entire field, but at most it is only a suggestion and gives no warrant for disregarding the plain words 'on any railroad engaged' in the first clause. True, if they were rejected, the two clauses, in the instance of a train composed of many cars, some moving interstate traffic and others moving intrastate traffic, would by their concurrent operation bring the entire train within the statute. But it is not necessary to reject them to accomplish this result, for the first clause, with those words in it, does even more, that is to say, it embraces every train on a railroad which is a highway of interstate commerce without regard to the class of traffic which the cars are moving. The two clauses are in no wise antagonistic, but, at most only redundant, and we perceive no reason for believing that Congress intended that less than full effect should be given to the more comprehensive one, but, on the contrary, good reason for believing otherwise. As between the two opposing views, one rejecting the words 'on any railroad engaged' in the first clause and the other treating the third clause as redundant, the latter is to be preferred, first, because it is in accord with the manifest purpose, shown throughout the amendatory act, to enlarge the scope of the earlier one and to make it more effective, and, second, because the words which it would be necessary to reject to give effect to the other view were not originally in the amendatory act, but were inserted in it by way of amendment while it was in process of adoption (Cong. Rec. 57th Cong., 1st Sess., vol. 35, pt. 7, p. 7300; Id. 2d Sess., vol. 36, pt. 3, p. 2268), thus making it certain that without them the act would not express the will of Congress.

"For these reasons it must be held that the original act as enlarged by the amendatory one is intended to embrace all locomotives, cars and similar vehicles used on any railroad which is a highway of interstate commerce."

See Texas & Pacific Ry. Co. v. Rigsby, 241 U. S. 33, 36 S. Ct. 482, 60 L. Ed. 874; Napier v. Atlantic Coast Line Ry. Co., 272 U. S. 605, 47 S. Ct. 207, 71 L. Ed. 432; C. B. & Q. Ry. Co. v. United States (8 C. C. A.) 211 F. 12.

While it is true that in the Southern Railway Case, the train, moving over a highway of interstate commerce, had both interstate and intrastate cars, yet the court applied the first clause of the amendatory provision, "on any railroad engaged," to a locomotive or car used on a railroad which is a highway of interstate commerce, and not its use in moving interstate traffic.

The acts have been held to apply to cars being moved in switching operations in which a part of the coupling and uncoupling was while switching on side tracks connected with the main line of the highway of interstate commerce, as the coupling and uncoupling of cars is generally confined almost to such operations. C. B. & Q. Ry. Co. v. United States, supra; United States v. Chesapeake & Ohio Ry. Co. (C. C. A.) 213 F. 748; United States v. Atlantic Coast Line Ry. Co. (D. C.) 214 F. 498. And also grants to an employé of a railroad a right of action for dam-

ages sustained by reason of defective appliances in violation of the Safety Appliance Acts, even though he was engaged at the time in moving intrastate traffic when the cars were used on a highway of interstate commerce. Delk v. St. Louis & S. F. Ry. Co., 220 U. S. 580, 31 S. Ct. 617, 55 L. Ed. 590; New York Central & H. R. Co. v. Carr, 238 U. S. 260, 35 S. Ct. 780, 59 L. Ed. 1298. [1-3] With force it is urged by the defendant that section 4 of the Act of 1910 (45 US CA § 13) relieves the carrier from statutory penalties while a car is being hauled to the nearest available point for repair. No duty rests upon a carrier to accept from a connecting line a car equipped in violation of the law, and want of knowledge as to the defect while in use will not excuse a violation or relieve from liability. Here we find that the defects were discovered and known to the defendant before it started to transfer the cars, and the equipment did not become defective while the cars were being hauled by the defendant, and the movement of them by the defendant was not for the purpose of making repairs. It is not shown that the repairs could not have been made where the defects were discovered, or that the defendant was trying to get the cars as speedily as possible off the busy track and place them where the defects could be repaired, and that such movement was necessary to make the repairs. No such showing appears here, as it is shown that the repairs could have been made at the interchange track where they were discovered as well as at the mill, and that the cars were not moved to the mill for that purpose, and were not at any time hauled to the nearest available repair point for repairs; on the contrary, it appears that they were discovered, and an attempt was made, by the Great Northern, to make the repairs, but it failed to do so, and when the defendant accepted and hauled the cars, under the circumstances here, with defective appliances, it did so at the peril of incurring the penalties under the Safety Appliance Acts. It is not material whether the defective condition of a car, under the acts, is or is not due to the negligence of the carrier, or that it exercised care, as the acts impose an absolute and unqualified duty to maintain the appliances in secure condition. United States v. Northern Pac. Ry. (9 C. C. A.) 287 F. 780; C. B. & Q. Ry. Co. v. United States, supra; United States v. Chesapeake & Ohio Ry. Co., supra. It is further clear from the record that the defendant received these three cars in a defective condition from the Great Northern, and hauled them for a distance over its own line and then to the mill, which was not a mere incidental movement such as a movement for the purpose of reaching other cars on the exchange track, as all of the string of thirteen cars were hauled by the defendant. The Circuit Court of Appeals for the Ninth Circuit has given the Safety Appliance Act a broad construction, and said that: "Under the statute only two defenses are permissible: First, a denial of the use of the defective car as charged; or, second, an affirmative defense stating that the car had been properly equipped, that such equipment became defective or insecure while in use by the carrier upon its line of railroad, that the car was being hauled from the place where the equipment was first discovered to be defective or insecure to the nearest available point where the defect could be repaired, that such movement was necessary to make the repairs, and that the repairs could not be made except at such repair point." United States v. Northern Pac. Ry. Co. (C. C. A.) 293 F. 657, 659. The defendant therefore does not bring itself within the proviso of the provision of section 4, amendatory of the Act of 1910.

■ It is further insisted by counsel for the defendant that as all of the cars were Great Northern cars which had been billed through to Dover by it and it collected the entire freight on them, and the transfer and spur tracks were jointly owned by the Great Northern and the defendant, and under the contract between the two companies the Great Northern was given its joint right to the use of the transfer and spur tracks, and the defendant was obligated to transfer over them the cars for the Great Northern, furnishing its crews, who were deemed joint employés of the parties, the Great Northern was in reality the party moving the cars, against whom the government has also filed a separate complaint for the same defects as charged against the defendant, who has consented to a judgment against it, which, it is contended, is a bar to this action. As stated, the spur track, leading from the defendant's main line to the mill, and over which the defendant hauled the defective cars, was used by it for the purpose of transporting cars loaded with logs from defendant's main line to the mill and for transporting cars loaded with lumber, some of which were destined to points outside of the state, from the mill to defendant's main line, which is a highway of interstate commerce. The defendant's train, with its local crew, then proceeded to the switching which was required of it to move the cars over a part of its highway of interstate commerce, hauled the cars to the mill

over a part of its main line and the spur track which it had an interest in, receiving $2 for each of the Great Northern's cars. The defendant was then hauling those defective cars over tracks which were a part of its highway of interstate commerce and was compensated for so doing, and it cannot by contract dispense with any care required of it by law. Philadelphia & R. Ry. Co. v. United States (C. C. A.) 191 F. 1, 4.

█ The fact that the government has also filed separate complaint against the Great Northern is not a double penalty relieving the defendant, for both companies, by their acts, as appears from the record, violated the acts of Congress in hauling the defective cars upon their highways of interstate commerce, and a penalty imposed against one would not be a bar to an action against the other.

Decree in favor of the United States may be entered as prayed for.